

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                               Case No. 06-CR-26 (LSA)

DEMETRIUS RODGERS,

        Defendant.

## PLEA AGREEMENT

1.     The United States of America, by its attorneys, Michelle L. Jacobs, Acting United States Attorney for the Eastern District of Wisconsin, and Daniel H. Sanders, Assistant United States Attorney, and the defendant, Demetrius Rodgers, individually and by attorney Thomas E. Harris, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.     The defendant has been charged in a one count indictment and a one count information which allege violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), 841(b)(1)(C) and 846.

3.     The defendant has read and fully understands the charge contained in indictment and information and fully understands the nature and elements of the crimes with which he has been charged and the charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.     The defendant voluntarily agrees to waive prosecution by indictment in open court.

5.     The defendant voluntarily agrees to plead guilty to Count One of the Information, set forth in full as follows:

> THE UNITED STATES ATTORNEY CHARGES:
>
> ### COUNT ONE
>
> Beginning sometime in 2000 and continuing until sometime in February of 2004, in the State and Eastern District of Wisconsin,
>
> **DEMETRIUS RODGERS,**
>
> defendant herein, knowingly and intentionally conspired with persons known and unknown to the grand jury to distribute cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).
>
> All in violation of Title 21, United States Code, Sections 841(b)(1)© and 846.

6.     The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offenses described in paragraph 5. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts contained in Attachment A beyond a reasonable doubt. This showing would be made based on the testimony of informants, cooperating co-conspirators, law enforcement officers, and citizen witnesses. The evidence would also include consensual recordings, documents, physical evidence obtained as a result of search warrants, traffic stops and arrests, pen/trap/toll analyses, wiretap monitoring, and physical surveillance. The defendant admits to these facts and that these facts establish his guilt beyond a reasonable doubt. This information is provided for the purpose of setting forth a factual basis for
2

the plea of guilty. It is not a full recitation of the defendant's knowledge of or participation in this offense.

## PENALTIES

7. The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following minimum and maximum terms of imprisonment, fine, and supervised release: 20 years, $1,000,000, and 3 years to life. The count also carries a mandatory special assessment of $100.00.

8. The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney, including any possibility that the defendant may qualify as a career offender under the sentencing guidelines.

## ELEMENTS

9. The parties understand and agree that in order to sustain the charge of conspiracy to distribute controlled substances as set forth in Count One, the government must prove each of the following propositions beyond a reasonable doubt:

First that the conspiracy as charged in Count One existed, and
Second that the defendant knowingly became a member of the conspiracy with an intention to further the conspiracy.

## SENTENCING PROVISIONS

10. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

3

11.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offense set forth in paragraph 5. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history for purposes of assisting the sentencing court in determining the defendant's criminal history category under the sentencing guidelines. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of defendant's criminal history category.

## Sentencing Guidelines Calculations

14.     The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the

defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

### Relevant Conduct

15. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which defendant is pleading guilty. The parties further acknowledge, understand, and agree to recommend to the sentencing court that the relevant conduct attributable to the defendant is greater than 15 kilograms, but less than 50 kilograms of a mixture and substance containing cocaine, a Schedule II controlled substance.

### Base Offense Level

16. The parties acknowledge and understand that the government will recommend to the sentencing court that the applicable base offense level for the offense charged in Count One of the Information is level 34 under Sentencing Guidelines Manual § 2D1.1(c)(2)(15-50 kilograms of cocaine). The parties further acknowledge and understand that the defendant may not join this recommendation and may recommend a lower base offense level.

### Acceptance of Responsibility

17. The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. The defendant acknowledges, understands, and agrees that conduct consistent with the acceptance of responsibility includes but

5

is not limited to the defendant's voluntary identification and disclosure to the government of any and all actual or potential victims of the offense prior to sentencing. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

18. Both parties reserve the right to apprise the district court and the probation office of any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

19. Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

20. The government agrees to make a non-guideline sentencing recommendation.

## Court's Determinations at Sentencing

21. The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The parties further understand that the United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the application of the sentencing guidelines and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further

understand that the sentencing court may, in certain circumstances, depart either upward or downward from the otherwise applicable guideline range.

22. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

23. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable upon entry of the judgment of conviction. The defendant agrees not to request any delay or stay in payment of any and all financial obligations.

### Special Assessment

24. The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

## DEFENDANT'S COOPERATION

25. The defendant, by entering into this agreement, further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so. The government agrees to advise the sentencing judge of the nature and extent of the defendant's cooperation. The parties acknowledge, understand and agree that if the defendant provides substantial assistance to the government in the investigation or prosecution of others, the government, in its discretion, may recommend a downward departure from any applicable statutory mandatory minimum and the applicable sentencing guideline range. The defendant acknowledges

and understands that the court will make its own determination regarding the appropriateness and extent to which such cooperation should affect the sentence.

## DEFENDANT'S WAIVER OF RIGHTS

26. In entering this agreement, the defendant acknowledges and understands that in so doing he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

> a. If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.
>
> b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.
>
> c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.
>
> d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.
>
> e. At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from

his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

27. The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

28. The defendant acknowledges and understands that he will be adjudicated guilty of each offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

29. The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

## Further Civil or Administrative Action

30. The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement is meant to limit the rights and authority of the United States of America or any other state or local government

to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## GENERAL MATTERS

31. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

32. The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

33. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

34. The defendant understands that pursuant to the Victim and Witness Protection Act and the regulations promulgated under the Act by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

### Further Action by Internal Revenue Service

35. Nothing in this agreement shall be construed so as to limit the Internal Revenue Service in discharging its responsibilities in connection with the collection of any additional tax, interest, and penalties due from the defendant as a result of the defendant's conduct giving rise to the charges alleged in the second superseding second superseding indictment.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

36. The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

37. The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 5-1-2009

DEMETRIUS RODGERS
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 5-2-09

THOMAS E. HARRIS
Attorney for Defendant

For the United States of America:

Date: 5-8-09

MICHELLE L. JACOBS
Acting United States Attorney

Date: 5-8-09

DANIEL H. SANDERS
Assistant United States Attorney

12

# ATTACHMENT A

For the last several years, the Milwaukee HIDTA has been involved in the investigation of a large scale drug trafficking organization operating in the Metropolitan Milwaukee area and elsewhere. Confidential informant information, pen/trap/toll analyses, wiretap monitoring, physical surveillance, search warrants, arrests and debriefings of cooperating defendants establish that Jerome Stovall began delivering multiple kilos of cocaine in Milwaukee beginning sometime in 1996. During the investigation, 19 subjects were identified as being involved in the Jerome Stovall cocaine conspiracy. The 19 subjects were subsequently indicted for Conspiracy to Distribute Cocaine. On February 12, 2004, officers and agents of several Local, State and Federal agency's attempted to arrest these subjects and executed several Federal search warrants. After their arrests numerous subjects admitted their involvement in this conspiracy, cooperated with the government and were debriefed. These subjects identified other participants in the conspiracy, including Demetrius Rodgers.

**Laron Ramsey**

Ramsey was indicted in the Jerome Stovall drug trafficking conspiracy. During debriefings with Ramsey in early 2004, Ramsey admitted buying numerous kilograms of cocaine from Jerome Stovall over the past several years. Ramsey admitted to selling the cocaine in different amounts to numerous people and making hundreds of thousands of dollars in the process. During the execution of search warrants at different locations connected to Ramsey, over $750,000.00 in U.S. Currency was recovered.

Demetrius Rodgers, also known as "NU-NU" purchased cocaine from Ramsey and would break it into smaller quantities and resell it. Ramsey sold cocaine to Rodgers for 2 to 3 years. The first deal between the two occurred in either 2000 or 2001 at Rodgers' residence in the area of 66th Street and W. Congress Street in Milwaukee. Ramsey sold Rodgers 9 ounces of cocaine for $5757.00. After that deal, Ramsey began to sell full kilograms of cocaine to Rodgers. The first full kilogram deal was for 3 kilograms, but Ramsey could not remember the exact price that Rodgers paid. Ramsey was sure the price was somewhere between $21,000.00 to 26,000.00 per kilogram. Ramsey "fronted" the cocaine to Rodgers and it took approximately 3-4 weeks for Rodgers to pay Ramsey. Approximately one month after this meeting, Ramsey sold another 3 kilograms of cocaine to Rodgers. This deal also occurred at Rodgers' residence located on N. 66th St. It took Rodgers a long time to pay for the cocaine. Rodgers provided partial payments to Ramsey until the full amount was paid. Ramsey fronted Rodgers with 3 kilograms every 1-2 months and then received partial payments back from Rodgers. The majority of these deals occurred at Rodgers' house on N. 66th St.

Rodgers moved to a residence at 4650 N. 52nd Street, Milwaukee. The SOI delivered cocaine to Rodgers inside of the residence at 4650 N. 52nd Street on 3-4 different occasions. Ramsey received payments from Rodgers at the residence approximately 8 times. During the last 3-4 drug deals between Ramsey and Rodgers, Ramsey sold all the cocaine he received from Stovall (5 kilograms each time) to Rodgers.

13

Ramsey described in detail the inside of Rodgers residence, as well as descriptions of several assets contained therein. Ramsey also stated that Rogers used to own a Suburban that he was trying to sell for $20,000. The rims and tires are worth $5,000, the truck is "jack proof" the only way to open the doors is with a remote. There are 2 surveillance cameras in it, one looks out the back of the truck, one out to the side, the monitors for them are both on the visor for the driver. There are 5 to 7 flat screen TV's in the vehicle.

Ramsey said that Rodgers did not have a job at the time he was dealing drugs, he had the mentoring service and the personal training service but Ramsey never saw him with any customers. Ramsey stated that Rodgers told him the best month he had selling cocaine he made $30,000, the worst was approximately $2,000. Rodgers sold his cocaine from 4 ½ ounces to 1 kilo quantities, he would meet with people at different locations or people would come to his house on 52nd St.

Ramsey knew several of Rodgers' customers as follows:

* Rogers main customer was someone named "Cal" who drove a gray Suburban w/ fancy rims. Rodgers sold 4 ½ to 1 kilo quantities to Cal. Ramsey had been at Rodgers house at 4650 N. 52nd St several times when Cal came over to buy cocaine. Ramsey went into another room during the transaction, but Rodgers told him that it was a drug deal and Ramsey helped Rodgers count the money at times, other times Ramsey just watched Rodgers count money;

* A B/M named Dennis was another customer of Rodgers. Dennis would purchase 9 ounces to ½ kilo's from Rodgers. Several times Dennis would come to Rodgers house at 4650 N. 52nd St., purchase cocaine and pay Rodgers. Ramsey observed Rodgers counting money once Dennis would leave;

* A B/M named Marcus, a.k.a. Black Boy, who lived in the area of 11th Lane and Chambers,. Marcus would buy 4 ½ to 9 oz quantities. Ramsey was with Rodgers 3 to 4 times when he delivered cocaine to Marcus in the area of 11th lane and W. Chambers. Ramsey did not see the transaction but Rodgers told him what he was doing and Ramsey observed Rodgers go into the house with a bag and return without the bag and with money. Ramsey stated that Marcus Murphy was both a customer of Rodgers and at times a supplier to Rodgers. Ramsey observed transactions between them on 2 to 4 occasions; and

* Josiphus Wilder, a.k.a. Little Joe. Ramsey was with Rodgers on 2 occasions when Rodgers delivered 4 ½ ounces to Wilder.

Ramsey also knew several individuals that supplied cocaine to Rodgers as follows:

* Dartavian Watson, a.k.a. Tavy, who lives in Racine, WI. Rodgers would buy 1 to 3 kilo's at a time from Watson. Ramsey observed this on 5 to 10 occasions. Watson would go to Rodgers' house on N. 52nd St. and bring the cocaine inside to complete the deals. This occurred between approximately 2002 and 2004;

14

* Gerald Rucks, a white male, supplied Rodgers in 1998 and 1999 until Rucks went to jail. Ramsey was present during approximately 10 deals where Rucks supplied Rodgers with 1 to 3 kilos each time. The deals occurred at Rodgers house at 4650 N. 52nd St.;

* Otis White, a.k.a. Tiger, supplied Rodgers with 1 to 3 kilos at a time in 1998 and 1999 before White went to jail. Ramsey was present at least 3 times during the transactions. They occurred at Rodgers house on 52nd st or at a bar that White was associated with on N. 9th st in the area near W. North Ave. Ramsey remembers that on one occasion White charged Rodgers $26,500 for one kilo;

* Michael Hawthorne was another supplier of Rodgers. Hawthorne would frequently travel to Atlanta, GA. Ramsey was at Rodgers house on N. 52nd St. two times when Hawthorne came over with a bag of clothes. Ramsey would leave the room and after Hawthorne left, Rodgers would show Ramsey the cocaine. Each time it was 1 to 3 kilos. On one occasion the cocaine that Hawthorne delivered was not good quality and when they called him back he was already on his way to Atlanta;

* Kenzie Carson supplied Rodgers in approximately 1995 to 1996. Rodgers was purchasing ½ to 1 whole kilo at that time. Ramsey observed these transactions 10 or more times. Carson would either bring the cocaine over to Rodgers house that was in the area of 45th and Hampton at the time or Rodgers and Ramsey would go to Carson's house that was in the area of Chambers and Hopkins; and

* Charles McCoy had been a supplier of Rodgers between approximately 1997 and 2000. Ramsey was at Rodgers house at 4650 N. 52nd St. approximately 5 times when McCoy came over and delivered 1 to 3 kilos of cocaine at a time to Rodgers. This stopped when McCoy went to jail.

Ramsey related that Rodgers used a cellphone with telephone number 414-839-7991 and a land-line telephone with telephone number 414-464-0113. Ramsey would call Rodgers' cellphone to facilitate drug deals. Telephone records indicate 297 calls between Ramsey and Rodgers' cellphone between July 1, 2003 and September 30, 2003. There were 44 calls between Ramsey and Rodgers' home telephone between July 13, 2003 and September 30, 2003.

Ramsey stated that he/she has been in Rodgers' house at 4650 N. 52nd Street on several occasions and stated that Rodgers has some type of safe in the closet of his bedroom. Ramsey has observed Rodgers activate a digital keypad entry system to this safe. In January or February of 2004, Ramsey delivered some money to Rodgers at his house on 52nd Street. Rodgers took the money to the closet in his bedroom and Ramsey heard the keypad being activated. Rodgers left the room without the money. Ramsey stated that he/she has observed Rodgers go to this safe and either take money out or put money in approximately 10 times. Ramsey related that Rodgers lives at this house by himself.

15

In the beginning of 2002, Ramsey gave Rodgers a gray plastic "Pelouze" brand scale to use for weighing cocaine. Ramsey knows that Rodgers owns a blue 1994 Chevrolet Suburban and that the Suburban has several plasma televisions in it. This vehicle is kept in the garage at 4650 N. 52nd Street. Rodgers also has a late 90's Buick Park Avenue that is turquoise in color.

Ramsey stated that Rodgers has a mentoring service and a personal trainer business, both being fronts to cover his drug activities. Ramsey did not know the names of the mentoring or physical trainer company name. Ramsey never saw Rodgers doing work regarding either business. Ramsey did not know Rodgers to have any legitimate employment during times of his drug dealing.

Ramsey used to assist Rodgers in cutting the cocaine. Most of the time they would do it at Rodgers house at 4650 N. 52nd St, in the dinning room on the marble table. They would break the kilos of cocaine down with a hard ball, put it into a blender, blend it to make it loose and flaky, then add 4 ½ to 6 ounces of baking soda and mix it together. They would spray a light mist of water over it and put it into a plastic bag. They would use books or pieces of wood or metal and C-Clamps to press it back into a rectangle kilo shaped size and let it dry. Ramsey stated that Rodgers sold two different qualities of cocaine. Rodgers called the high quality cocaine "glass" and the cocaine that had been cut as "chalk."

Ramsey stated that he/she has been with Rodgers on several occasions when Rodgers used the alias name of "Brendan Fisher." Rodgers has told Ramsey he puts things in other people's names in order to avoid detection by police. Utilities at 4650 N. 52nd St. #1 list to "Brendan Fisher."

Ramsey stated that in 2004, Rodgers opened a beauty supply store named "His and Hers Beauty Supply," located at 5608 W. Burleigh Street, Milwaukee. Case agents have observed Rodgers in the store and his car, a Buick listed under Felix Ramsey at 5859 N. 60th St., parked out front on several occasions. Utilities at this location list to Demetrius and Trina Rodgers. Ramsey said that Trina Rodgers is Rodgers' sister, an MPS teacher that teaches 6-8 grade Social Studies and English. The business is listed with the phone company as "His and Hers Beauty Supply", at 5608 W. Burleigh, Milwaukee, WI, (414) 442-7555. The building owner is Irvin Bostwick of 5604 W. Burleigh, (414) 354-1299.

**Eric Knox**

Knox was also indicted in the Jerome Stovall conspiracy and admitted his involvement in the conspiracy and is cooperating with the government in this and other investigations. Knox stated that in the summer of 1993, Knox sold ½ ounce quantities of powder cocaine to Demetrius Rodgers. Rodgers was known to Knox as NU-NU. Knox sold ½ ounces to Rodgers on two separate occasions for $350.00 each. Both times Rodgers paid up front for the cocaine. One of the deals took place at Rodgers house near Hampton Avenue in Milwaukee and the other deal occurred in the area of N.11th Lane and W. Locust Street in Milwaukee.

## Josiphus Wilder

Wilder was indicted in the Jerome Stovall conspiracy. Wilder admitted his involvement in the conspiracy and is cooperating with the government. Wilder stated that he/she has known Demetrius Rodgers, who Wilder also knows as NU-NU, since approximately 1988. In 1996, Rodgers began to supply Wilder with 1/8 ounce quantities of cocaine for $100.00 each. Wilder purchased an eight-ball of cocaine approximately once a week for the period of at least one year. During this time, Rodgers was living in a house on N. 11th Lane near W. Burleigh Street in Milwaukee. Wilder stopped purchasing cocaine from Rodgers sometime in 1997.

Sometime in the summer of 2003, Wilder began purchasing cocaine again from Rodgers. At that time, Rodgers had a cellphone number of 414-839-7991. Rodgers charged $2,750 for 4 ½ ounces of cocaine that Rodgers called "chalk." Wilder stated that cocaine that Rodgers called "chalk" was usually cut the with something. Rodgers also sold better quality cocaine that Rodgers called "glass" and he would charge $3,000 for 4 ½ ounces. Wilder initially purchased 4 ½ ounces of "chalk" cocaine from Rodgers for $2,750.00 and Wilder paid for the cocaine on delivery. Wilder received the cocaine from Rodgers at Rodgers' house located on N. 52nd or N. 53rd Street near Courtland or Hampton Avenues. (4650 N. 52nd St.) Wilder described the house as a duplex or four-family house with a large garage. Wilder stated that the house is on the east side of the street, with a fire hydrant near the driveway (4650 N. 52nd st). Wilder purchased 4 ½ ounce quantities of cocaine from Rodgers approximately once a week from the summer of 2003 to either September or October of 2003. Once during the summer of 2003, Wilder purchased a ½ kilogram of "glass," or good, cocaine from Rodgers for $12,000.

Wilder stated that sometime after he stopped buying cocaine from Rodgers, Rodgers picked up Wilder in a gray Corvette and fronted him 4 ½ ounces of cocaine. Rodgers told Wilder that Wilder owed Rodgers $3,000 for the fronted ½ kilogram of cocaine. Wilder never paid Rodgers back for the ½ kilogram.

Wilder stated that Rodgers owns a green Buick Park Avenue with tinted windows and a mid to late 1990's General Motors sport utility vehicle that is blue and gray. This vehicle has a Cadillac Escalade front end on it and "Devon" rims painted the same color as the vehicle. Wilder knows Rodgers to have an early 2000's gray Corvette and a blue and gray racing motorcycle. Ramsey confirmed that Rodgers owned a Chevy Suburban, the Corvette, and the motorcycle. Rodgers bought the Corvette from Rick Bowers at Prestige Auto that used to be located on W. Lisbon Ave. Rodgers gave the Corvette to Dartavian Watson for payment for cocaine after Ramsey was arrested. Watson was later stopped in California driving the Corvette and was arrested because it had been reported stolen by Prestige auto. Ramsey stated the motorcycle is the biggest of the racing type motorcycles called the "High Booster." Ramsey knew it was listed in Natalie Fowlkes name, who is a girlfriend of Rodgers.

Once Wilder was indicted, Rodgers called a relative of Wilder and offered to pay for a lawyer for Wilder. Telephone records show that between June 8, 2003 and August 29, 2003, there were 104 telephone calls between Wilder and Rodgers' cellphone number, 414-839-7991.

**Corey Nash**

Nash has also provided information to case agents about the drug trafficking activities of Demetrius Rodgers. Nash stated the he was introduced to Demetrius Rodgers, also know as "Nu-Nu," in 1992 or 1993 by a subject named Otis White. Nash related that White was later indicted on a drug charge, served time and has since been released. White was charged in a federal drug case, convicted, sentenced to prison, and is currently on supervised release in this district.

Nash, in cooperation with White, "fronted" 4 ½ ounce quantities of cocaine to Rodgers approximately once a week for over a two year period. White and Nash charged Rodgers $3,250 to $3,500 for each 4 ½ ounce quantity. Rodgers would go to White's record store called "O's Music Land" located N. Teutonia and W. Finn in Milwaukee to pick up the cocaine from White and Nash. Rodgers moved up to 9 ounce quantities and Nash supplied Rodgers with 9 ounces 2-3 times. Rodgers then moved up to ½ kilogram quantities. Nash stopped supplying Rodgers with cocaine when Otis White was arrested on a federal drug charge on March 16, 1999.

**Information provided by Rodgers**

On Monday, February 16, 2004, case agents observed a 1997 Buick Park Avenue bearing Wisconsin License Plates 247-GJZ in front of 4259 N. 62nd St., which is the house of Laron Ramsey's mother, Evelyn Robinson. The auto was stopped by uniformed officers and the driver was identified as Demetrius L. Rodgers (DOB:1/14/68 of 3015 N. 11th LN, 263-3689). The license plate lists to a Felix Ramsey. Rodgers told Detective Smith that Laron Ramsey is his cousin. Rodgers stated that he owns the "Peaceful Journey Mentoring Service" and stated his cell phone number is 839-7991.

On March 18, 2004, case agents interviewed Demetrius Rodgers. The interview took place pursuant to a proffer letter provided by the United States Attorney's Office for the Eastern District of Wisconsin. Rodgers' attorney, Thomas Flannigan, was also present. Rodgers admitted to being a cocaine dealer. He started in the early 1990's by purchasing "eight ball" quantities of cocaine, breaking it down into $10.00 amounts (dimes) and selling them to make a profit. Rodgers purchased cocaine from several subjects who were indicted in the Jerome Stovall conspiracy. He purchased 9 ounce quantities of cocaine from Eric Knox (a.k.a. E-Forty) and Willie Ealy (a.k.a. Nubbs or June) starting in 1998. Rodgers purchased 9 ounce quantities from them 3 to 10 times over from 1998 to 2002 or 2003. During one of the deals Darylvocia Greer was present.

Rodgers learned in 1995 that his cousin, Laron Ramsey was dealing cocaine and being supplied by Jerome Stovall. Prior to August 1, 2001, the day Jerome Stovall was shot, Rodgers received 1 kilogram of cocaine from Laron Ramsey. Between the summer and fall of 2003 Rodgers

received 5 kilograms on each of two separate occasions from Laron Ramsey. He paid $23,000.00 per kilogram to Ramsey. Rodgers would add a cutting agent to the cocaine and then break it down into 4 ½ ounce to 9 ounce quantities and sell it to several customers. One of the customers was Josiphus Wilder who was indicted in the Stovall conspiracy. Starting in the summer of 2003, Wilder was buying 4 ½ ounce quantities from Rodgers for $3,000.00. Rodgers stated that sometimes Wilder would buy two to three 4 ½ ounce quantities in a single day.

When Rodgers was dealing drugs he stored some of it in his house at 4650 N. 52nd St. He hid it in the basement behind the insulation. He also stored some of it at his girlfriend's house on 53rd St, (3734 A N. 53rd St Natalie Fowlkes) and in the garage at that location.

19

Case 2:06-cr-00026-LA   Filed 05/08/09   Page 19 of 19   Document 26